# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Ira Green, Inc. | ) | |
| 177 Georgia Avenue | ) | |
| Providence, RI 02905 | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 07-782C |
| v. | ) | (Senior Judge Hodges) |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF IRA GREEN, INC'S OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS

Christopher M. Johnson
CENTRE LAW GROUP, LLC
1953 Gallows Road, Suite 650
Vienna, VA 22182
Counsel for Plaintiff, Ira Green, Inc.
(703) 288-2800
Fax: (703) 288-4868

April 4, 2008

Of Counsel: James S. Phillips
Brian C. Caney

## TABLE OF CONTENTS


I. Introduction......1

II. Questions Presented......2

III. Statement of the Case......2

A. Nature of the Case......2

B. Statement of Facts......4

1. NEXCOM Funding......4

2. Ira Green / NEXCOM Contract Negotiations / Execution......4

IV. Argument......5

A. This Court Has Subject Matter Jurisdiction to Entertain Count III of Ira Green's Compliant Alleging a Statutory Claim Against NEXCOM......5

1. Legal Standards for Review of 12(b)(1) Motions to Dismiss......5

2. Legal Standards Regarding Tucker Act and NAFI Doctrine......6

3. Application of Legal Standards to Present Case......7

B. Ira Green States a Valid Claim for Breach of Contract by NEXCOM......10

1. Legal Standards for Review of (12)(b)(6) Motion to Dismiss......10

2. Legal Standards Regarding Contract Formation......11

3. Application of Legal Standards to Present Case......13

V. Conclusion......14

# TABLE OF AUTHORITIES

## Cases

AG Route Seven Partnership v. United States, 57 Fed. Cl. 521 (2003)..........................11

AINS, Inc. v. United States, 365 F.3d. 1333 (Fed. Cir. 2004)..................................7,8

Algonac Mfg. Co. v. U.S., 428 F.2d 1241 (Ct. Cl. 1970)........................................11

Anderson v. United States, 344 F.3d 1343 (Fed. Cir. 2003).......................................11

Bell Atlantic Corp. v. Twombley, 127 S. Ct. 1955 (2007)...................................10,14

Cal. Fed Bank FSB v. United States, 245 F.3d 1342 (Fed. Cir. 2001)..........................11

Core Concepts of Florida, Inc. v. United States, 327 F.3d 1331 (Fed. Cir. 2003)..............7

Henke v. United States, 60 F.3d 795 (Fed. Cir. 1995)...............................................6

Industrial Door Contractors, Inc. v. U.S., 200 Fed. Appx. 977 (Fed. Cir. 2006)...............11

J. Cooper & Associates, Inv. v. United States, 53 Fed Cl. 8 (2002)..........................11,12

Lowe v. United States, 80 Fed. Cl. 420 (2008)........................................................10

Maher v. United States, 314 F.3d 600 (Fed. Cir. 2002)..........................................11

Martin v. Morgan Drive Away, Inc., 665 F.2d 598 (5th Cir. 1982)............................6,9

Metric Constructors, Inc. v. NASA, 169 F.3d 747 (Fed. Cir. 1999)..........................11,12

Miller v. United States, 530 F. Supp. 611 (E.D. Pa. 1982).......................................6,9

Moyer v. United States, 190 F.3d 1314 (Fed. Cir. 1999)..........................................6,9

North Hartland, LLC v. United States, 78 Fed. Cl. 172 (2007)..................................5,6

OAO Corporation v. U.S., 17 Cl. Ct. 91 (1989)......................................................11

Perez v. United States, 156 F.3d 1366 (Fed. Cir. 1998)...........................................10

Ransom v. United States, 900 F.2d 242 (Fed. Cir. 1990).........................................10

Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746 (Fed. Cir. 1988)....................6

Scheuer v. Rhodes, 94 S. Ct. 1683 (1974) ......10

Southern Foods, Inc. v. United States, 76 Fed. Cl. 769 (2007)......7,8

St. Clair v. City of Chicago, 880 F.2d 199 (9th Cir. 1989)......6

Torncello v. United States, 231 Ct.Cl. 20 (1982)......12

Total Medical Management, Inc. v. United States, 104 F.3d 1314 (Fed. Cir. 1997)......12,13

Trauma Services Group v. United States, 104 F.3d 1321 (Fed. Cir. 1997)......11

Varilease Tech Group, Inc. v. United States, 289 F.3d 795 (Fed. Cir. 2002)......12

**Statute**

28 U.S.C. § 1491......9

# INDEX TO APPENDIX


| Document | Page |
| --- | --- |
| Affidavit of Michael McAllister | PA1 |
| Ira Green / Nexcom Agreement of Northeast Uniform Centers | PA4 |
| OPNAV INSTRUCTION 5450.331 | PA7 |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Ira Green, Inc.<br>177 Georgia Avenue<br>Providence, RI 02905<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant | ) | No. 07-782C<br>(Senior Judge Hodges) |

## PLAINTIFF IRA GREEN, INC'S OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS

**COMES NOW** Plaintiff, Ira Green, Inc. ("Green"), by and through undersigned counsel and in accordance with Rule 7.2 of this Court, hereby files this Opposition to Defendant United States' ("Defendant") Motion to Dismiss.[1] As more fully described below, the Court should deny Defendant's Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

## I. Introduction

Dismissal of this matter at this stage is premature, a conclusion that is supported by documents that the Government has submitted in support of its own motion. This case concerns a contract for Green to provide its merchandize for sale at Navy Exchange Service Command

[1] For purposes of reference to Defendant's Motion to Dismiss in citations, such Motion will be referred to as "Def. Motion."

(NEXCOM) facilities. The documents that the Government has relied upon demonstrate the existence of a factual dispute regarding whether the merchandise at issue actually was funded by appropriated funds or non-appropriated funds. The Government's affidavits do not even specify that Green's merchandize was funded only by non-appropriated funds. Other documents that the Government has submitted indicate that NEXCOM obtains funding from appropriated funds. The Court should allow this case to proceed so that the parties can conduct discovery on NEXCOM's funding sources.

Green's complaint correctly pleads the facts necessary to establish the existence of a contract between Green and NEXCOM. The attached Affidavit of Green's President, Michael McAllister, as well as the agreement at issue, establish that, at a minimum, there is a factual dispute concerning the formation of the contract and the terms of the agreement between the parties. The court should not dismiss the case until the parties have conducted discovery concerning the formation of the contract at issue.

## II. Questions Presented

1. Whether Count III of the Complaint should be dismissed for lack of subject matter jurisdiction based on jurisdictional limitations of the Tucker Act.

2. Whether Counts I and II of the Complaint should be dismissed for failure to state a claim upon which relief can be granted based on Defendant's claim that Green failed to properly plead the existence of a contract.

## III. Statement of the Case

### A. Nature of the Case

In April 2005, NEXCOM and Green executed an agreement (the "Contract") whereby NEXCOM agreed that Green would sell and provide certain items and services to Northeast

Uniform Centers until such time that a competitive solicitation covering such items and services was issued and awarded. Compl. ¶ 5. On September 1, 2006, NEXCOM breached the Contract by (1) discontinuing the Green line of insignia items at the NEX Newport location as of October 1, 2006 and (2) informing Green that it would no longer be buying items known as Navy Ratings Badges from Green for any of the Uniform Centers. Compl. ¶ 6. After NEXCOM breached the Contract, NEXCOM then violated CICA by exclusively utilizing another contractor—Vanguard—on a sole-source basis to provide the sales and services at the Uniform Centers without obtaining full and open competition. Compl. ¶ 8.

To date, NEXCOM has discontinued purchasing Green's Navy Ratings Badges and has eliminated its line of insignia items at NEX Newport, and also discontinued purchasing any of Green's Navy Ratings Badges and line of insignia items at several of the other Northeast Uniform Centers. Compl. ¶ 6. These actions have caused Green to incur damages in the amount of $90,000, which includes (1) lost revenues based on Green's 2005 sales to NEX Newport and interest on such revenue; (2) costs associated with Green's inventory that was manufactured and procured to support the insignia item program at NEX Newport; and (3) costs associated with Green's inventory of Navy Ratings Badges that NEXCOM no longer purchases. Id.

Green made numerous attempts to resolve this matter through correspondence with NEXCOM. When those actions proved unsuccessful, Green was forced to file a claim and request a Contracting Officer's Final Decision on May 1, 2007. In a Final Decision dated August 29, 2007, NEXCOM Contracting Officer Terry Nichols denied Green's claim in its entirety. Compl. ¶ 7.

B. Statement of Facts

1. *NEXCOM Funding*

NEXCOM is an entity within the Department of the Navy. Def. Motion, p. 2. NEXCOM's primary responsibility is technical management of the many Navy Exchanges (NEXs). Green Appendix ("Green App."), p. PA7 (OPNAV INSTRUCTION 5450.331); Def. Motion, p. A6. Commander, Naval Supply Systems Command (COMNAVSUPSYSCOM), who is the NEX program manager, has delegated such technical management to NEXCOM. Id. Therefore, NEXCOM itself is not considered a Navy Exchange. See id. While non-appropriated funds are used to support the NEX mission, the Department of the Navy's OPNAV INSTRUCTION 5450.331 clearly states that "[a]ppropriated funds are to be used to the fullest extent possible." Green App., p. PA8; Def. Motion, p. A7. Thus, the Navy's *own instruction* indicates that appropriated funds are available to NEXs and NEXCOM. Id.

2. *Ira Green / NEXCOM Contract Negotiations / Execution*

In early 2003, Green approached NEXCOM regarding the sale of Green's merchandise at NEXCOM facilities. Green App., p. PA1, ¶ 7 (Affidavit of Michael McAllister). Approximately one year later, Green and NEXCOM began to seriously discuss Green's ability to provide such merchandise. Green App., p. PA2, ¶ 8. Throughout much of 2004, Green and NEXCOM met and discussed a proposed plan under which Green would supply NEXCOM with various merchandise for its facilities. Green App., p. PA2, ¶ 9. Finally, after much negotiation and back-and-forth discussions, NEXCOM agreed in September/October 2004 to begin drafting the Contract with Green. Green App., p. PA2, ¶ 10.

During and throughout discussions, revisions, and execution of the contract, NEXCOM communicated to Green that the Contract "would allow Ira Green to familiarize itself with

NEXCOM and certain accounts in preparation for additional business through a [future] competitive solicitation." Green App., p. PA2, ¶ 11. NEXCOM even went as far to suggest that Green visit accounts to introduce itself and become familiar with the accounts. Id. In addition, NEXCOM (1) assured Ira Green that this was a "contract," (2) indicated that Green would be given an opportunity to increase its business with NEXCOM through a future competitive solicitation, and (3) specifically stated that it anticipated splitting the market "between two or three suppliers." Green App., p. PA2, ¶ 13.

After many revisions and back-and-forth discussions regarding the intent and purpose of the Contract, the contract was executed on or about April 4, 2005. Green App., p. PA2, ¶¶ 12, 14. Pursuant to the Contract, Green would provide and service insignia, embroidery, and other commodities (the "Merchandise") to various NEXCOM Uniform Centers until a future "best-value" award was made for such merchandise. Green App., p. PA2, ¶ 15 & p. PA4 (Ira Green/Nexcom Agreement) (the "Contract"); Def. Motion, p. A1. In order to be compensated for providing and servicing the Merchandise, Green had to comply with specified conditions and requirements as set forth in the Contract. Id. Based on the plain meaning of the Contract, Green and NEXCOM had a mutual understanding that Green would provide and service the Merchandise until a future competitive solicitation was issued. Green App., p. PA2, ¶ 15 & p. PA4; Def. Motion, p. A1.

## IV. Argument

### A. This Court Has Subject Matter Jurisdiction to Entertain Count III of Ira Green's Complaint Alleging a Statutory Claim Against NEXCOM

#### 1. *Legal Standards for Review of 12(b)(1) Motion to Dismiss*

When reviewing a motion to dismiss for lack of subject matter jurisdiction, the relevant facts alleged in plaintiff's complaint must be accepted as true, North Hartland, LLC v. United

States, 78 Fed. Cl. 172, 176 (2007), citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988), and all inferences pertinent to subject matter jurisdiction must be interpreted favorably to the plaintiff. North Hartland, LLC, 78 Fed. Cl. at 177, citing Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). During its review of a motion to dismiss for lack of subject matter jurisdiction, the Court is permitted to analyze materials other than the pleadings in a more liberal manner than is normally encouraged in motion to dismiss situations. See North Hartland, 78 Fed. Cl. at 179. Specifically, a defendant should be allowed to present additional material to support its assertion of subject matter jurisdiction, and "'fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the compliant . . . are challenged.'" Id., quoting Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999). This consideration of material outside the pleadings should not stop at material and information readily available to the defendant; a defendant should be given the opportunity to conduct discovery and/or provided an evidentiary hearing if it is possible that sufficient jurisdictional facts may be discovered. See Martin v. Morgan Drive Away, Inc., 665 F.2d 598 (5th Cir. 1982), cert. denied 458 U.S. 1122, 103 S. Ct. 5, 73 L. Ed. 2d 1394 (1982) (holding evidentiary hearing); Miller v. U.S., 530 F.Supp. 611 (E.D. Pa. 1982), aff'd 729 F.2d 1448 (3d Cir. 1984) (afforded plaintiff opportunity to conduct discovery); St. Clair v. City of Chico, 880 F.2d 199 (9th Cir. 1989), cert. denied 493 U.S. 993, 110 S. Ct. 541, 107 L. Ed. 2d 539 (1989) (additional discovery should be afforded if possible for jurisdictional facts to be established).

2. *Legal Standards Regarding Tucker Act and NAFI Doctrine*

While Defendant is correct that the jurisdictional grant in the Tucker Act generally does not apply to non-appropriate fund instrumentalities (NAFIs) pursuant to the so-called NAFI doctrine, it fails to recognize that NEXCOM is not a NAFI for purposes of this jurisdictional bar.

In Southern Foods, Inc. v. United States, 76 Fed. Cl. 769 (2007)this Court clarified that the "rule excluding NAFIs from the court's jurisdiction has been narrowly construed to apply when 'by law, appropriated funds *not only are not used to fund the agency, but could not be*.'" (emphasis added). In other words, if it is possible for Congress to appropriate funds to the agency, the NAFI doctrine does not apply and the Court may exercise Tucker Act jurisdiction to entertain a statutory claim against the agency. Id.; see also Core Concepts of Florida, Inc. v. U.S., 327 F.3d 1331 (Fed. Cir. 2003), cert. denied 124 S. Ct. 805, 157 L. Ed. 693 (2003) (holding that it is irrelevant whether appropriated funds have actually be used by the agency; relevant inquiry is whether they could receive appropriated funds if necessary). The court in AINS, Inv. v. United States set forth a four-factor test to determine whether an instrumentality is a NAFI for purposes of Tucker Act jurisdiction:

> [a] government instrumentality is a NAFI if: (1) It does "not receive its monies by congressional appropriation[]"; (2) It derives its funding "primarily from [its] own activities, services, and product sales[]"; (3) Absent a statutory amendment, *there is no situation in which appropriated funds could be used for fund the federal entity*[]; *and* (4) There is a "*clear expression by Congress that the agency was to be separated from general federal revenues*."

Southern Foods, quoting AINS v. United States, 365 F.3d 1333, 1342 (Fed. Cir. 2004) (internal citations omitted) (emphasis added). The court in Southern Foods goes on to say that the court will retain jurisdiction *if even one of these factors* is not met. Id.

3. *Application of Legal Standards to Present Case*

Based on the legal standards and case law cited above, this Court should deny Defendant's motion to dismiss for lack of subject matter jurisdiction. Pursuant to the standard that requires courts to make inferences in the light most favorable to the Plaintiff, this Court simply should not conclude that the Complaint filed by Green did not properly allege subject matter jurisdiction to be considered sufficient at the pleadings stage. Certainly, there are relevant

factual assertions that remain in dispute. Such disputed facts are actually the result of a document included in the Defendant's Motion to Dismiss as the third attachment. In that document, entitled OPNAV INSTRUCTION 5450.331, page 2 under section b(2) reads in part: "Appropriated funds (APF) are to be used to the fullest extent possible as authorized by reference (b). Reference (b) is NAVCOMPT Manual, Vol. 7, seemingly another document in NEXCOM's possession and unavailable to Green without discovery. This statement, on its face, appears to indicate that NEXCOM receives appropriated funds for certain things, or at the very least, can receive such funds under certain circumstances. Thus, pursuant to the holdings in Southern Foods and AINS that indicate that an instrumentality is not a NAFI if it can receive appropriated funds, this is a very relevant and major factual development that must be explored.

While the Defendant spends considerable time citing cases for the proposition that the NAFI doctrine does not waive sovereign immunity for statutory claims such as a CICA violation, it misses the point entirely about whether for purposes of this case NEXCOM should be considered a NAFI under the black letter law of Southern Foods and AINS. Regardless of whether NEXCOM is mentioned in the NAFI exception section of the statute, it is not a NAFI under the Tucker Act jurisdictional bar if it can potentially receive appropriate funds. Furthermore, while the Tucker Act does specifically name Navy Exchanges in 28 U.S.C. 1491(a), OPNAV INSTRUCTION 5450.331 indicates that NEXCOM was delegated responsibility for technical management of the Navy Exchanges; it itself is not a Navy Exchange. Def. Motion, p. A6. Therefore, the fact that Navy Exchanges are specifically mentioned in the Tucker Act has no bearing on whether NEXCOM, a separate entity, is a NAFI for purposes of Tucker Act jurisdiction.

Therefore, this Court should not dismiss this claim for lack of subject matter jurisdiction without allowing Green to explore additional documents through discovery and/or an evidentiary hearing, as allowed by many cases in other courts, such as Morgan, Miller, and St. Clair cited above. If there was no indication that NEXCOM received appropriated funds, then dismissal would be appropriate. However, that is clearly not the case here and Green must be given the opportunity to prove subject matter jurisdiction.

Furthermore, the Declaration of Tom Burke and the Declaration of Terry Nichols, which were attached to the Defendant's Motion to Dismiss, do not resolve the issue of whether NEXCOM is a NAFI for purposes of Tucker Act jurisdiction. Tom Burke simply states that "NEXCOM pays for Department E-1 uniform insignia items with non-appropriated funds" and Terry Nichols avers only that "All merchandise mentioned in the April 4, 2005 Agreement upon which Ira Green, Inc.'s lawsuit is based, whether purchased from Ira Green, Inc. or any other supplier, comes within the E-1 department code." These statements avoid addressing the critical issue, which is whether Green's merchandize actually was purchased with appropriated funds. That is the most relevant inquiry based on the above case law. The Declarations do not even address the instruction attached to the Motion, which *recommends* using appropriated funds "when possible." Thus, these issues must be fully explored by the Court, and denying Defendant's Motion to Dismiss for subject matter jurisdiction (or at the very least delaying a ruling until discovery is completed/evidentiary hearing is held) will allow these issues to be resolved fairly and thoroughly.

B. Ira Green Sates a Valid Claim for Breach of Contract by NEXCOM

1. *Legal Standards for Review of (12)(b)(6) Motion to Dismiss*

Despite Defendant's assertions regarding a proper analysis of a 12(b)(6) motion to dismiss, such motion should only be granted if after construing the facts liberally, those same facts do not entitle the plaintiff to relief. Lowe v. United States, 80 Fed. Cl. 420, 421 (2008), citing Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998). In addition, the Supreme Court recently issued a decision in Bell Atlantic Corp. v. Twombley that discusses and updates the standards for reviewing 12(b)(6) motions. In this case, the Court stated that plaintiff's factual allegations "'must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (*even if doubtful in fact*).'" 127 S.Ct. 1955, 1965 (2007) (emphasis added); see also Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683 (1974) (overruled on other grounds) (holding that complaint sufficient to survive 12(b)(6) motion even if plaintiff has little chance of recovery). Also, Bell Atlantic specifically dealt with the issue of whether a valid agreement was executed. In addressing that issue, the Court opined that a complaint only needs to contain "plausible grounds" in order to infer agreement; there is not a "probability requirement at the pleading stage." Id. Finally, the Court in Bell Atlantic stressed the importance of considering the discovery process when deciding these motions by stating that a complaint survives a motion to dismiss for failure to state a claim as long as the complaint contains sufficient facts to set up a "'reasonable expectation that discovery will reveal evidence.'" Lowe, 80 Fed. Cl. at 421, quoting Bell Atlantic, 127 S. Ct. at 1966; see also Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990) (holding that "[w]hether a contract exists between a plaintiff and the United States is a mixed question of law and fact").

2. *Legal Standards Regarding Contract Formation*

As a matter of law, the Government is bound by its express contracts. See Algonac Mfg. Co. v. U.S., 428 F.2d 1241, 1255 (Ct. Cl. 1970); OAO Corporation v. U.S., 17 Cl. Ct. 91, 98 (1989). The required elements of an express contract are "a mutual intent to contract including an offer, an acceptance, and consideration." Maher v. U.S., 314 F.3d 600, 606 (Fed. Cir. 2002), quoting Trauma Services Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). In addition, there must be "a Government representative who had actual authority to bind the Government." Industrial Door Contractors, Inc. v. U.S., 200 Fed. Appx. 977, 979 (Fed. Cir. 2006) (unpublished opinion), quoting Cal. Fed. Bank FSB v. United States, 245 F.3d 1342, 1346 (Fed. Cir. 2001).

In order to demonstrate that there has been a valid offer and acceptance, there must first be a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it, " Industrial Door Contractors, 200 Fed. Appx. at 979, quoting Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003), followed by "conduct, which, reviewed objectively, indicates assent to the proposed bargain." AG Route Seven Partnership v. United States, 57 Fed. Cl. 521, 536-37 (2003). Review of the circumstances surrounding a potential binding agreement must be based on an analysis of the *contemporaneous circumstances*. J. Cooper & Associates, Inc v. United States, 53 Fed. Cl. 8, 18 (2002) (emphasis added), citing Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999) (internal citations omitted). In other words, the parties' intent regarding the alleged contract is determined by looking objectively at the conduct at the time such alleged contract was executed; statements regarding intent made in subsequent litigation are

not relevant. J. Cooper & Associates, 53 Fed. Cl. at 18, quoting Varilease Tech Group, Inc. v. United States, 289 F.3d 795, 799 (Fed. Cir. 2002).

Finally, courts have consistently held that if it is a close question as to whether a binding contract was formed, the question should be resolved in favor of the plaintiff. See J. Cooper & Associates, 53 Fed. Cl. at 19-20, quoting Torncello v. United States, 231 Ct. Cl. 27, 681 F.2d 761 ("'We assume that the parties intended that a binding contract be formed. Thus, any choice of alternative interpretations, with one interpretation saving the contract and the other voiding it, should be resolved in favor of the interpretation that saves the contract'"). The court in J. Cooper & Associates summarized courts' reluctance to hold that a binding contract was not formed with this quote: "Courts *have been loathe to interpret a contract out of existence*." 53 Fed. Cl. at 20.

Cases have dealt directly with the issue of whether an agreement or document that is not labeled a "contract" can nonetheless be considered a binding contract under the law. For example, in Total Medical Management, Inc. v. United States, 104 F.3d 1314, 1320 (1997), the United States Court of Appeals for the Federal Circuit held that Memorandum of Understandings (MOUs) were in fact binding contracts because despite not being labeled contracts, the evidence presented demonstrated valid offer and acceptance, consideration, and mutuality of obligation. In addition, the court in Total Medical Management dismissed the notion that contracts must explicitly set forth a method for determining or remedy for a breach. Id. The court described its holding as follows:

> [T]he obligations of the parties are clear: TMM is to provide discounted medical services; the hospital is to provide free space and support staff and to encourage dependents to use TMM's services . . . . The determination of damages or specific performance would flow naturally fro a breach of these duties.

Id.; see also Restatement (Second) of Contracts §§ 71, 72 (1981) ("A contract is not unenforceable merely because it does not fit into a recognized category").

3. *Application of Legal Standards to Present Case*

Clearly, the Contract at issue in this case is enforceable against NEXCOM. NEXCOM states its intention in the Contract for Ira Green to "*supply product and vendor service to these locations under the terms of this agreement until the effective date of awards . . . .*" After all, the case law cited above indicates that the Contract is binding and enforceable on NEXCOM. Pursuant to such case law, the basis standard for express contract is "a mutual intent to contract including an offer, an acceptance, and consideration," as well as the consent of "a Government representative who had actual authority to bind the Government" Here, a long negotiation and discussion regarding terms and intent was followed by the execution of the Contract under which Green provided NEXCOM with Merchandise compliant with certain terms and conditions in exchange for compensation and the assurance that such Contract would remain valid until a competitive solicitation was issued requesting offers to supply the Merchandise. See generally Green App., p. PA1-PA2, ¶¶ 7-17; Green App. p. PA4-PA6; Def. Motion, p. A1-A3. The Contract spells out the intentions of NEXCOM, what it expects under the Contract, and when such Contract will end. Id. In addition, the Contract contains the valid signatures of Michael McAllister, President, Ira Green, Inc. and Mark O Winge, Division Merch. Mgr., Uniforms, NEXCOM, which also indicates valid offer and acceptance. Green App., p. PA6; Def. Motion, p. A3. Therefore, all elements of a valid express contract are present.

Furthermore, even if this Court is not satisfied that the plain language of the relevant documents in this case indicate that the Contract is a binding agreement between NEXCOM and Green, the circumstances do not warrant granting a 12(b)(6) motion to dismiss for failure to state

a claim upon which relief can be granted. First, if facts are construed in a light favorable to the plaintiff, this Court must conclude that the breach of contract claim should go forward. Based simply on the plain language of the Contract and Mr. McAllister's Affidivat, there is, at the very least, a factual dispute as to whether the Contract was a binding agreement. Furthermore, as stated very recently by the Supreme Court in Bell Atlantic, the potential that discovery will produce evidence to allow the plaintiff to prove its case is a mandatory inquiry. At the pleading stage, the plaintiff is not responsible for proving its claims with evidence – that is for discovery. If there is any indication that discovery will reveal evidence to support plaintiff's claims, the case must move forward. Certainly, with the clearly debatable issue of whether a contract exists outstanding, discovery is crucial and must be allowed to move forward.

Finally, the fact that the Contract is not labeled a "contract" on its face and the Government is determined to minimize its binding authority by calling it everything other than a "contract," does not matter in analyzing whether dismissal is appropriate or whether a contract exists. According to the case law above, an objective analysis must be conducted that examines the intent of the parties at the time the Contract was executed. Certainly, based on the conduct of the parties during the execution of the Contract in light of the legal requirement that all facts be construed in the light most favorable to the plaintiff, the breach of contract claim must move forward.

## V. Conclusion

For the aforementioned reasons, Plaintiff Green requests that this Court deny Defendant's Motion to Dismiss in whole.

Respectfully submitted,

Christopher M. Johnson
CENTRE LAW GROUP, LLC
1953 Gallows Road, Suite 650
Vienna, VA 22182
Counsel for Plaintiff, Ira Green, Inc.
(703) 288-2800
Fax: (703) 288-4868

Date: 4/4/07

Of Counsel: James S. Phillips
Brian C. Caney

**CERTIFICATE OF FILING**

I hereby certify that on this 4th day of April 2008, a copy of the foregoing "PLAINTIFF IRA GREEN, INC'S OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Christopher M. Johnson
Christopher M. Johnson

# INDEX TO APPENDIX


| Document | Page |
|---|---|
| Affidavit of Michael McAllister | PA1 |
| Ira Green / Nexcom Agreement of Northeast Uniform Centers | PA4 |
| OPNAV INSTRUCTION 5450.331 | PA7 |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Ira Green, Inc. | ) | |
| 177 Georgia Avenue | ) | |
| Providence, RI 02905 | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 07-782C |
| v. | ) | (Senior Judge Hodges) |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## AFFIDAVIT OF MICHAEL MCALLISTER

I, Michael McAllister, swear and state as follows:

1. I am President of Ira Green, Inc. ("Green").

2. I have held the position of President of Green since April 1999.

3. As President of Green, I personally negotiate, approve, and execute all contracts and agreements on behalf of Green.

4. On or about April 4, 2005, Green and the Navy Exchange Service Command (NEXCOM) memorialized the terms of an agreement entitled "Ira Green / Nexcom Agreement on Northeast Uniform Centers" (the "Agreement").

5. I personally negotiated, approved, and executed the Agreement on behalf of Green.

6. I was personally present for all negotiations and/or discussions regarding the Agreement prior to and including the date on which it was executed.

7. Green first approached NEXCOM, specifically NEXCOM representative Mark Winge, on or about February 2003 regarding the sale of Green's merchandise at NEXCOM facilities, which is the subject of the Agreement.



PA1

8. I spoke with Mark Winge on or about February 6, 2004 and we began to discuss Ira Green's ability to provide merchandise to NEXCOM.

9. Throughout 2004, Ira Green personnel, including myself, met with various representatives of NEXCOM and began to structure a plan to supply NEXCOM with merchandise.

10. In September and October of 2004, NEXCOM representatives Mark Winge and Rich Larson informed me they were willing to enter into an agreement with Ira Green to supply merchandise to NEXCOM accounts.

11. Mark Winge specifically indicated he would enter into an agreement that would allow Ira Green to familiarize itself with NEXCOM and certain accounts in preparation for additional business through a competitive solicitation at the end of a year or so. Mark Winge suggested that I visit a number of accounts, such as Newport and New London. He arranged for introductions and encouraged me to visit these accounts as soon as possible.

12. On numerous occasions, Mark Winge and I emailed the draft Agreement with mark-ups to each other. On each revision, we discussed its intent and purpose.

13. Mark Winge continued to assure me this was a contract under which Ira Green would supply NEXCOM with military insignia and related uniform items. He also assured me there would be additional opportunity to increase business with NEXCOM through a competitive solicitation. Mark Winge envisioned the market being split between two or three suppliers.

14. At the conclusion of negotiations and discussions regarding the specific terms and conditions of the Agreement on or about April 4, 2005, NEXCOM presented the Agreement to Green.

15. Under the terms of the Agreement, NEXCOM offered to have Green provide and service insignia, embroidery, and other commodities (collectively the "Commodities") to NEXCOM Uniform Centers in Newport, New London, Brunswick, Kittery, Sotia, and Saratoga Springs until awards were made for the Commodities on a "best-value" basis in exchange for Green's consent to specified conditions and requirements and, which were set forth in the Agreement.

16. Pursuant to the Agreement, Green would be compensated for providing and servicing the Commodities pursuant to Open Purchase Orders (OPOs) in exchange for providing and servicing such Commodities to NEXCOM.

17. NEXCOM and Green had a mutual understanding as set forth in the Agreement that this Agreement would remain effective and active until awards were made for the Commodities on a "best-value" basis.



PA 2

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

Date: April 3, 2008

Michael McAllister
President
Ira Green, Inc.

**STATE OF RHODE ISLAND**
**COUNTY OF PROVIDENCE, to wit:**

The foregoing instrument was acknowledged before me this 3 day of April, 2008, by Michael McAllister.

#51074
Notary Public

My commission expires: 2/27/11.



PA3

4 April 2005

**Ira Green / Nexcom Agreement on Northeast Uniform Centers**

1. Effective in the April/May 2005 time frame Ira Green will begin assuming responsibility for providing and servicing insignia, embroidery and related accessories to six Uniform Centers in the Northeast. These stores include Newport, New London, Brunswick, Kittery, Scotia and Saratoga Springs. Nexcom's intention is to have Ira Green continue to supply product and vendor service to these locations under the terms of this agreement until the effective date of awards for Uniform Centers worldwide on these commodities. Award will likely be made to multiple resources on a "best value" basis. It is assumed that vendor responsibility for providing and servicing product will be regional in nature and include all commodity groups. It is anticipated that the effective date of any vendor changes based on these awards will be Spring 2006.

2. Cost prices, terms and freight considerations will be as indicated on the Open Purchase Orders (OPOs) which Nexcom Code MU will provide to Ira Green shortly in advance of the Northeast implementation. These cost, terms and freight considerations will not be adjusted during this agreement. Nexcom will, however, consider price adjustments on items containing gold or rhodium if there are radical increases in the cost of those metals. The increase must be at least 25% since the effective date of this agreement. The proposed cost increase of each item must only be up to the extent that the higher metal cost adds to the cost of the finished item. Ira Green must request the change and must provide substantiation of the increased cost of the metal.

3. Nexcom will supply individual OPOs by commodity by store. These OPOs will remain in effect during the course of the agreement.

4. Product which Ira Green provides that is subject to certification by the Navy Clothing and Textile Research Facility will meet the certification specifications.

5. Items provided will mimic those that have been provided by Vanguard in these locations over the past one year plus. There may be items that by mutual agreement will continue to be provided to the Northeast NEXs from Vanguard on a special order basis. These would be selected, low usage items for which supplying product to the patron in a timely manner is critical.

6. Ira Green will not assume responsibility for any Vanguard merchandise currently in the six stores. All Vanguard merchandise will be pulled from sale and transferred to other NEXs and the SEDC. Vanguard and store personnel will be responsible for the handling of the Vanguard merchandise.

7. For each location, Ira Green will ship in fresh merchandise just prior to the transition date. They will work in tandem with store personnel in preparing merchandise for stocking and in the actual stocking of merchandise. (The agreed upon stipulations on vendor servicing on an ongoing basis are found elsewhere in this agreement.)

PA 4

8. Ira Green packaging width and length will be virtually identical to Vanguard's packaging on an item to item basis. Since the Ira Green package sizes and assortments for each store will basically mirror Vanguard's, the placement of each SKU on the sales floor will be virtually the same as placement of the comparable Vanguard SKU.

9. Store size assigned to each store along with service frequency and total hours of vendor service provided each month are indicated below.
-Newport is a class A store with weekly service and 32 to 40 hours per month of service.
-New London is a B store with weekly service and 16 to 20 hours per month of service.
-Brunswick is a C store with service every two weeks and 8 to 15 hours per month of service.
-Kittery, Saratoga Springs and Scotia are all E stores with service every four weeks and up to five hours of service per month.

10. Specific Ira Green responsibilities during each store visit include:
-*Maintain neat stock room (A - C stores),

-Label all items with UPCs (All store sizes),

-**Assist store associates in stocking sales floor (A - C),

-***Count and order merchandise (All),

-Assist patrons, limited to insignia (All),

-Keep uniform manager/supervisor apprised of problems (All),

-Provide store associates with info on new items/changes (All) and

-Assist with defective merchandise returns (All).

* Ira Green will not be required to reset stock rooms or label shelves, but they will place back stock in the proper location. In addition, they may be asked to assist with floor shelf labels during scheduled insignia resets.

** Store personnel will be responsible for day to day maintenance of the sales floor at in stores of all size levels.

*** Stores will be responsible for initiating emergency orders between scheduled visits by contacting the Ira Green store representative. In stores that are serviced on a less than weekly frequency, the Ira Green store representative will check with store management via telephone at least once in between scheduled visits to help take care of unexpected merchandise needs.

11. Ira Green store representatives will visit stores based on the agreed upon call frequency and place orders as necessary during each visit. Turn around time from placement of order to receipt of goods on OPO orders will vary from two to five working days, depending on store location.

PA 5

12. Ira Green will maintain a fully staffed Customer Service Dept. that will take care of Navy Exchange special orders. Special orders will be made for items that a customer has need of that are included on the NEX's OPOs but not routinely carried in that store. Customers often require these items on short notice. Store personnel will utilize the toll free number and/or fax. Each account will be provided with Special Order forms that can be filled out and phoned or faxed to Customer Service.

13. Ira Green agrees to take back for full credit any merchandise which is found to be defective or that does not meet NCTRF certification specifications. Product which is abused by customers is not Ira Green's responsibility.

14. If a particular store becomes overstocked on items that are part of the store's current stock assortment, Ira Green will either provide guidance as to which other Ira Green supported Uniform Centers the merchandise can be transferred to without causing overstocks at the receiving location, OR they will take the merchandise back for full credit. In the event of a dispute between store management and Ira Green, the Nexcom Commercial Accessories Buyer will intervene and make a determination.

15. Ira Green will strive to maintain all six locations at a 96% or higher in stock level at all times for items included in each store's current assortment. Nexcom will run periodic in stock reports using system on hand information.

16. Ira Green will strive to achieve a stock turn of at least 3.5 turns per year at New London, 3.0 turns at Newport, 2.5 turns in C stores and 1.5 stock turns in E stores.

17. On a monthly basis, Nexcom will provide Ira Green with system on hand information for all Ira Green insignia in each of the six stores. Nexcom will provide scanned sales data on these items and stores on an "as requested" basis.

[signature]
Michael McAllister
President
Ira Green, Inc.

Date: 05APR05

[signature]
Mark O. Winge
Divisional Merch. Mgr., Uniforms
Nexcom

Date: 7 April 2005

PA 6

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D.C. 20350-2000

IN REPLY REFER TO
OPNAVINST 5450.331
N413
14 May 98

OPNAV INSTRUCTION 5450.331

From: Chief of Naval Operations
To: All Ships and Stations (less Marine Corps field addressees not having Navy personnel attached)

Subj: RESPONSIBILITY AND AUTHORITY FOR NAVY EXCHANGE OPERATIONS

Ref:
(a) OPNAVNOTE 5450 Ser 09B22/3U510444 of 14 Jun 93
(b) NAVCOMPT Manual, Vol. 7
(c) OPNAVINST 1700.7D
(d) OPNAVINST 1700.13A
(e) SECNAVINST 5040.3
(f) SECNAVINST 7548.1
(g) NEXCOM Pub. 145

1. Purpose. To issue responsibility for policy, overall coordination and execution of Navy Exchange (NEX) programs within the Navy.

2. Background. Events have led to an ongoing drawdown of U.S. Military Forces and a renewed focus on reducing duplication and increasing efficiencies, while providing quality products and services at a savings for the NEX customer. The NEX is an integral part of the local command structure and enhances quality of life and family support. To provide for the viability of Navy nonappropriated fund (NAF) programs and to obtain further operational efficiencies, Navy leadership has recommended organizational changes in the operation of exchanges.

3. Navy Exchange Mission. To provide our customers quality goods and services at a savings, and to support quality of life programs.

4. Responsibility and Authority

a. NEXs are established by authority of the Secretary of the Navy and operate as a departmental activity of each base. Commander, Naval Supply Systems Command (COMNAVSUPSYSCOM) is designated program manager for NEXs, Navy Lodges and Navy Uniform Program and has delegated technical management responsibility to the Navy Exchange Service Command (NEXCOM). NEXCOM is responsible for:

PA 7

(1) Providing command and primary support, operational policies and procedures, and retail and services management responsibilities for the operation of NEXs to assure that sound business policies and procedures are established for system wide mission achievement.

(2) Fiscal management of NEX operations to ensure continuing effectiveness and protection of NAF assets. NEX general managers retain retail and services management control and accountability for funds, fixed assets and inventory through NEXCOM per reference (a).

(3) Developing and issuing fiscal management and control procedures necessary for protection and efficient administration of NAF resources.

(4) Establishing appropriate procedures for auditing NEX operations.

(5) Maintaining program and management oversight of NEXs through on-site reviews to ensure their continued effectiveness in meeting mission requirements and patron needs.

(6) Recruitment, development and placement of managers in NEX management level positions.

b. NEX operations will be under the military command of the installation commanding officers. The commanding officer is responsible for the achievement of the mission of the NEXs and ensuring that the services and support provided are responsive in meeting the needs of the customer. The commanding officer has the authority to operate the exchange within the parameters established by the program manager (NEXCOM). Responsibilities are:

(1) Review all performance to ensure the support and services provided are responsive and comprehensive in meeting the needs of the customer.

(2) Commanders must devote necessary attention and authorize resources to effectively manage these services and ensure the solvency and stability of the funds. Appropriated funds (APF) are to be used to the fullest extent possible as authorized by reference (b).



PA 8

Case 1:07-cv-00782-RHH Document 7-2 Filed 03/07/2008 Page 9 of 10



(3) Ensure the provisions of reference (c) are met when assigning program responsibilities to ensure the strength and viability of both NEX and Morale, Welfare and Recreation (MWR) programs.

(4) NEX general managers report to the commanding officer and are responsible for appropriate compliance with the parameters appearing in references (a) through (g). Deviations from regulations, instructions, or other formal policy guidance and statements require the written approval of NEXCOM via the chain of command.

(5) Primary performance evaluation responsibility with input from NEXCOM. All general manager positions will require a second level review by NEXCOM.

c. The MWR/NEX Board of Directors established in reference (d) shall provide guidance to NEXCOM in fulfilling these assigned responsibilities. The board will:

(1) Serve to accommodate the interests of the major claimants in regard to major policy initiatives.

(2) Review the financial projections and plans for the various program elements and evaluate their effectiveness.

(3) Ensure equitable distribution of APF resources for NEX operations and/or capitalization. Ensure adequate distributions of nonappropriated funds to support operational and capitalization needs to the NEX and MWR programs.

d. Major claimants are responsible for monitoring NEX programs under their command. A continuing review, including management and fiscal oversight, will be maintained to ensure their effectiveness to the same extent as all other elements of command responsibility. To this end, NEX operations will be included in command inspections conducted per reference (e). NEXCOM will provide trained auditors and program personnel to assist in these inspections. The chain of command is responsible for adhering to system discipline and financial performance standards within the scope of authority and responsibility as prescribed by applicable Department of Defense, Secretary of the Navy, and NEXCOM directives.

Case 1:07-cv-00782-RHH Document 7-2 Filed 03/07/2008 Page 10 of 10

OPNAVINST 5450.331
14 MAY 1988

5. Action. NEXCOM, major claimants, and commanding officers shall effect continuing action to comply with the contents of this instruction.

W. J. HANCOCK
Deputy Chief of Naval
Operations (Logistics)

Distribution:
SNDL Parts 1 and 2



PA 10